UNITED STATES of America,
Plaintiff–Appellee,

v.

Martin J. HUGHES, Defendant–
Appellant.

No. 91–3720.

United States Court of Appeals,
Sixth Circuit.

Argued April 6, 1992.

Decided May 13, 1992.

Rehearing and Rehearing En Banc
Denied July 30, 1992.

Christian H. Stickan, Asst. U.S. Atty., Office of U.S. Atty., Cleveland, Ohio (argued and briefed), for plaintiff-appellee.

Percy Squire (argued and briefed), Catherine M. Ballard (briefed), Bricker & Eckler, Columbus, Ohio, Martin J. Hughes, III, Marion, Ohio, for defendant-appellant.

Before: MARTIN and RYAN, Circuit Judges; and WILHOIT, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Martin Hughes, a former labor union official, appeals his sentence for various violations of the Internal Revenue Code and federal false statements statutes. In *Hughes v. United States*, 899 F.2d 1495 (6th Cir.1990), this court addressed Hughes' first appeal in this case. We affirmed in part and reversed in part the district court's decision and remanded the case for re-sentencing. Hughes is presently appealing the re-sentencing. For the following reasons, we affirm Hughes' sentence.

Martin Hughes was charged and found guilty of breaching his trust as the manager of a union branch of the Communication Workers of America. We need not recite the facts surrounding his conviction because they are found in *Hughes*, 899 F.2d at 1495. To put the present appeal in context, however, we need to detail the terms of both Hughes' original sentence and his new sentence.

Hughes' first sentencing occurred on November 13, 1987. At that time, the district court sentenced Hughes to two years probation for assisting in the filing of false W–2 tax forms and fined Hughes $10,000 for ten counts of falsifying union records.

In addition, the court imposed on Hughes a three-year civil and employment disability, as authorized by 29 U.S.C. § 504 of the *Labor Management Reporting and Disclosure Act of 1959*. The disability imposed by the court barred Hughes from representing or serving as an officer in Communication Workers of America for three years. The district court's imposition of the three-year term represented a discretionary reduction downward from section 504's automatic imposition of a *thirteen*-year disability. The court reduced the disability to three years because it believed Hughes' conduct resulted from a misguided but benign interest in helping his union.

Thereafter, the parties initiated their first appeal to this court. On January 13, 1988, we stayed imposition of the three-year disability pending completion of the appeals process. On April 4, 1990, we affirmed Hughes' conviction and sentence with two exceptions. First, we ordered the reinstatement of the felony convictions contained in counts thirty-six and thirty-seven of the indictment. These counts were for making false statements on labor reporting documents, in violation of 18 U.S.C. § 1001. Second, we ordered the district court to reduce the felony conviction for count thirty-four, which regarded falsified W–2 forms, to a misdemeanor.

Hughes sought certiorari from the United States Supreme Court. While petition for review was pending, Hughes requested that we continue to stay his disability. We granted his request for a continued stay on June 12, 1990. Thereafter, the Supreme Court denied his request for certiorari. The stay expired on December 5, 1990, after we issued a mandate ordering re-sentencing and formally terminating the appeals process.

The district court re-sentenced Hughes on August 1, 1991, after two days of hearings. The court heard additional evidence that, the court stated, had a "bearing on the efficacy of any sentence to be imposed." The new evidence demonstrated

---

* The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

that, since the time of his original sentencing in 1987, Hughes had continued to meddle in the affairs of the Communication Workers of America. Even though Hughes was dismissed from his vice-president position three days after his original sentencing, he persisted in attempting to control Communication Workers of America activities by (1) maintaining his old office, (2) giving orders to union secretaries, and (3) controlling funds without authorization. Hughes apparently utilized his former office space through the summer of 1988 and only left after the union ordered him to leave. Additional evidence at the re-sentencing hearing showed Hughes interfered with three union accounts that contained significant amounts of money. The court's re-sentencing determination noted that because Hughes' offenses were committed prior to the *Sentencing Reform Act of 1984*, the court had broad discretion in the way in which it could fashion a new sentence.

■ On appeal, Hughes protests the court's consideration, at re-sentencing, of matters that occurred following Hughes' first appeal. Hughes' complaint is not directed at the court's specific factual determinations, but rather against the district court's ability to consider such subsequent conduct. We reject this claim and note that the district court has broad discretion to consider information in a sentencing determination.

Count thirty-four charged Hughes with violating 26 U.S.C. § 7204. Hughes was found guilty of violating section 7204 for furnishing an employee of United Telephone Credit Union with a false W–2 form. Under this misdemeanor conviction, the district court could have ordered Hughes to pay a $1,000 fine, could have sentenced him to one year in prison, or both. At re-sentencing, the court imposed two years probation instead of the maximum penalties allowed under law. Moreover, the court found Hughes exempt from serving this probation because Hughes had already served two years probation for the felony conviction under the same count. *See North Carolina v. Pearce*, 395 U.S. 711, 716, 89 S.Ct. 2072, 2075–76, 23 L.Ed.2d 656 (1969) (court should reduce probation period to reflect time already served).

Counts thirty-six and thirty-seven of the indictment charged Hughes with violating 18 U.S.C. § 1001, which prohibits falsification of information given to government agencies. Hughes violated this section when he caused the Communication Workers of America to file false "LM–2" reports with the Department of Labor. Unions annually submit LM–2 reports to the Department of Labor. The reports disclose the salary and expenses of employees who receive more than $10,000 during the year. If convicted under section 1001, a person could have to pay up to $10,000 in fines, serve up to five years in prison, or both. At re-sentencing, the district court suspended Hughes' sentence under both counts, and ordered three years of probation for each count, running concurrently.[1]

The district court then considered whether it was still appropriate to reduce Hughes' automatic civil employment disability from thirteen years to three years, given this court's order reinstating the felony convictions under counts thirty-six and thirty-seven. The district court found that reduction of the automatic disability was now inappropriate in light of Hughes' conduct since his first sentencing. Specifically, the court found that "his actions demonstrate[d] a general contempt for the existing authority of the union." The court noted that section 504 was designed to purge the labor movement of its criminal element and to prevent convicted union leaders from regaining control of union government. The court emphasized that it

---

1. During the initial re-sentencing, the district court sentenced Hughes to *five* years of probation on counts thirty-six and thirty-seven. After finding that (1) Hughes had already served two years probation under counts thirty-three and thirty-four, and (2) this two years went towards the five-year sentence for counts thirty-six and thirty-seven, the court reduced the five year probationary period for counts thirty-six and thirty-seven. The court found that a reduction was required under 18 U.S.C. § 3651, which prohibits consecutive terms of probation totaling more than five years on separate counts of *one* indictment.

was not sentencing Hughes to the thirteen-year disability *because* of his actions since the original sentencing. The court stated that, in order to give full effect to the statute's provisions, it was merely refusing to exercise its discretion to reduce a statutorily required thirteen-year period. Under the court's order, Hughes may not exercise "any decision-making authority over any organization, committee, or account that receives any of its funds from a labor organization and/or its members for the purpose of contributing money to political candidates" during the time he is subject to the section 504(a) disability.

Shortly after re-sentencing, the district court amended its re-sentencing order to credit Hughes for time already served under the thirteen-year disability. The court found that the disability first became effective on November 13, 1987, which is when the court originally sentenced Hughes. The district court ruled that our stay, which we issued on January 13, 1988, tolled the disability period from that date until December 5, 1990, which is the date the district court received the mandate ending the appeals process. Accordingly, the district court reduced Hughes' thirteen-year civil and employment disability by the nine months and twenty-six days Hughes had already served under the disability.

Hughes makes four arguments on appeal. First, Hughes argues that the thirteen-year disability under section 504 is a violation of the United States Constitution's *Ex Post Facto* Clause because the disability imposes punishment on Hughes in excess of the punishment that could have been imposed lawfully at the time the criminal conduct occurred. Second, Hughes argues that the Double Jeopardy Clause precludes imposition of a sentence for count thirty-six because the conduct underlying count thirty-six also formed the basis for count thirty-four. Third, Hughes complains that the language of the district court order pertaining to the disability provision is overly broad and violates Hughes' First Amendment right to freedom of association. Finally, Hughes argues that the district court erred in calculating the amount of credit he should receive for time

he had already served under the section 504 disability. For the reasons described below, we reject all of Hughes' arguments.

Hughes argues that imposition of a thirteen-year disability for his conduct with regard to counts thirty-six and thirty-seven represents an *ex post facto* imposition of punishment because the statutory disability for this conduct was enacted subsequent to the occurrence of Hughes' criminal behavior. The government responds that this issue is controlled by Supreme Court case law that holds that legislative restrictions on convicted felons that are enacted as a means of preventing corruption in areas subject to governmental regulation are not *ex post facto* laws even if applied retrospectively. Thus, according to the government, the provisions in section 504(a) do not constitute criminal "punishment."

The sequence of events is undisputed. Hughes was convicted in November, 1987, under counts thirty-six and thirty-seven for violating 18 U.S.C. § 1001, which prohibits falsification of information given to government agencies. This conviction was based on conduct undertaken by Hughes while he worked at the Communication Workers of America in 1982 and 1983. At the time of Hughes' criminal activity, the *Labor Management Reporting and Disclosure Act of 1959* imposed disabilities on persons convicted of certain criminal offenses by preventing them from engaging in union activities; *however, in 1982 and 1983, section 1001 offenses were not among the listed offenses giving rise to section 504(a) disability. See* 29 U.S.C.A. § 504. In 1984, Congress amended section 504(a) and increased the number of offenses that give rise to disability, including section 1001 violations. The amendment, which became effective on October 12, 1984, applies to *any judgment or conviction entered after October 12, 1984, notwithstanding the date of the conduct that constituted the event.* Hughes was convicted and sentenced in 1987.

■ We must ascertain whether or not this legislation represents the retroactive application of punishment or, instead, is

merely a legislative device aimed at strengthening regulations in an area susceptible to corruption. Hughes does not dispute that the statutory language of amended section 504(a) clearly permits application of the disability provision to his conduct in 1982 and 1983. However, Hughes argues that the statute, as applied, constitutes an *ex post facto* law.

We would begin by noting that the Supreme Court has held similar forms of legislation to be non-penal in nature. In *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960), the Supreme Court upheld the constitutionality of the *New York Waterfront Commission Act of 1953*. This act prohibited union officers and agents who had been convicted of a felony from collecting union dues or other funds from union employees. Even though the Supreme Court found the act disqualified convicted felons from union office, *id.* at 157–58, 80 S.Ct. at 1153–54, it held that barring convicted felons from certain employments was a familiar legislative device to ensure against corruption in specified, vital areas. *Id.* at 158–59, 80 S.Ct. at 1153–54. In specifically addressing the *ex post facto* challenge to the act, the Court stated:

> The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is *whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation,* such as the proper qualifications for a profession.

*Id.* at 160, 80 S.Ct. at 1155 (emphasis added). According to the Court, the purpose of the statute was not to punish ex-felons but to regulate the waterfront and, therefore, the statute was not an *ex post facto* law. *See also Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (upholding New York statute making it a misdemeanor for anyone convicted of a felony to practice medicine). Similarly, in *Fleming v. Nestor*, 363 U.S. 603, 613, 80

S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960), the Court held that

> [w]here the source of legislative concern can be thought to be the activity or status from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected.

One circuit court has addressed and rejected an *ex post facto* challenge to section 504(a). *See Postma v. Inter. Bro. of Teamsters*, 337 F.2d 609 (2d Cir.1964) (upholding retroactive imposition of disability in the 1959 version of section 504). The Second Circuit in *Postma* found the Supreme Court rationale in *De Veau* completely controlled any *ex post facto* analysis. We agree with the Second Circuit's rationale. The 1984 amendment to section 504(a), which simply expands the list of criminal statutes subject to section 504(a)'s disability provisions, does not change the propriety of the *Postma* analysis.

Hughes argues, however, that *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) is direct precedent in support of his proposition that section 504(a)'s disability is penal in nature. In *Brown*, the Supreme Court found that a portion of section 504, which made it a criminal act for a member of the communist party to serve as an officer or employee of a labor union, acted as a bill of attainder by inflicting punishment without trial on such persons. *Id.* at 448–49, 85 S.Ct. at 1714–15. To support his claim that the section 504(a) disability is a form of punishment, Hughes points to the Court's statement that "section 504 inflicts 'punishment' *within the meaning of the Bill of Attainder Clause.*" *Id.* at 457, 85 S.Ct. at 1719 (emphasis added). Hughes argues that this statement renders the application of section 504(a) in his case unconstitutional as an *ex post facto* imposition of punishment.

We find the *Brown* opinion distinguishable from the case before us. *Brown* was written during a unique and dark period of our political history, when irrational fears of "subversives" in our society had reached a fever-pitch. The Court's analysis in

*Brown* was pointedly aimed at remedying the legislative hysteria of the preceding decade, which had culminated in legislation explicitly targeting communists. Further, the *Brown* opinion addressed the Bill of Attainder Clause and was not intended as a disposition of an *ex post facto* challenge to this provision. Given the Court's holding only five years earlier in *De Veau*, 363 U.S. at 155–58, 80 S.Ct. at 1152–54, where it discussed section 504 at some length and did not fault its application to convicted felons, we find it would be ill-advised to extend *Brown* so as to essentially overturn *De Veau*.

As a final matter, we note that congressional history supports our determination that section 504(a)'s disability provision is not an *ex post facto* imposition of punishment, as applied to convicted felons. In *Brown*, the Court found that Congress's sole intent in promulgating section 504's anti-communist provision was "to purge the governing boards of labor unions of those whom Congress regard[ed] as guilty of subversive acts and associations." *Brown*, 381 U.S. at 460, 85 S.Ct. at 1721. In contrast, the congressional history for section 504, as it applies to convicted felons, indicates that members of Congress designed the provision based on a rational desire to protect union members and the public interest from further meddling by union officials who have been convicted for certain conduct. *See* 129 Cong.Rec. 16367–70, Statement of Senator Hatch (purpose of the new provision was not to inflict new punishment but rather to bring relief to the union membership from harm caused by convicted officials); 129 Cong.Rec. 16372, Statement of Senator Nunn (Act does not impose punishment for past criminal conduct and, based on *De Veau* and *Postma*, is on "firm and constitutional ground").

After examining the intent of Congress, the language of the act, and the act's application, we find that the disability imposed on Hughes is not an *ex post facto* imposition of punishment. Because we do not consider the disability imposed on Hughes to be penal in nature, we affirm the district court.

Hughes argues that the Double Jeopardy Clause of the Fifth Amendment precludes his conviction under count thirty-six because the same conduct formed the basis for his conviction under count thirty-four. The government responds that the separate sentences imposed on Hughes for his conviction under counts thirty-four and thirty-six should not be overturned because (1) the submission of a false 1982 W–2 form to the IRS, which is the basis of count thirty-four, is a different offense from the submission of a false LM–2 report to the Department of Labor, which is the basis of count thirty-six; and (2) we may refuse to consider the double jeopardy claim under the concurrent sentencing doctrine.

■■■ As an initial matter, we agree with the government that the concurrent sentencing doctrine, which is a discretionary doctrine, applies. *See Dale v. Haeberlin*, 878 F.2d 930, 935 n. 3 (6th Cir.1989). A court should exercise its discretion not to review an issue where it is clear that there is no collateral consequence to the defendant and the issue does not otherwise involve a significant question meriting consideration. *Id.* Hughes is properly subject to the same probationary period and the same section 504(a) union disability for counts thirty-six and thirty-seven. Therefore, because there is no likely collateral consequence to Hughes of being sentenced on both counts, we find no significant legal issue to compel our attention.

■■■ We also note that Hughes' claim fails on substantive grounds as well. Hughes argues that 26 U.S.C. § 7204 constitutes a lesser included offense of 18 U.S.C. § 1001. Section 7204 reads in pertinent part as follows:

> [A]ny person required under the provisions of section 6051 [which requires employers to provide W–2 forms to employees] to furnish a statement who willfully furnishes a false or fraudulent statement or who fails to furnish a statement [violates this provision]....

Section 1001 provides in pertinent part as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of

the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations [violates this provision]. ...

We do not consider the language of section 1001 as precluding a simultaneous conviction for a violation under section 7204. While the statutes could be construed as having some overlap, this is not problematic. Here, the prosecution under section 7204 stems from the filing of a false W–2 form, while the prosecution under section 1001 derives from the filing of falsified "LM–2" reports. These are separate courses of conduct for which separate and discrete sanctions and punishment are applicable. The recent Supreme Court decision of *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), expressly permits the government to prosecute a defendant for multiple offenses in a single proceeding. *See also United States v. Louisville Edible Oil Products*, 926 F.2d 584, 588 (6th Cir.1991); *United States v. Sammons*, 918 F.2d 592, 604–605 n. 21 (6th Cir.1990). In *Edible Oil*, we emphasized that the *Blockburger* test requires a determination of "whether each provision requires proof of an additional fact which the other does not." 926 F.2d at 588 (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). *Grady* does not mitigate our application of the *Blockburger* analysis.

Hughes was convicted under count thirty-four for aiding and assisting in the submission of a false W–2 form, in violation of 26 U.S.C. § 7206(2). Hughes' conviction under count thirty-six of the indictment arose from his violation of 18 U.S.C. § 1001. Under count thirty-four, the jury found that Hughes, on behalf of Communication Workers of America, had submitted a false W–2 form to the Internal Revenue Service. Under count thirty-six, the jury found that Hughes had caused the Communication Workers of America, in a matter within the jurisdiction of the United States Department of Labor, to submit a false labor report to the Department of Labor. These are distinct proofs of two separate courses of conduct and simultaneous con-

victions for both courses of conduct do not violate Hughes' constitutional rights.

Hughes argues that his First Amendment right to associate is violated by the district court's order that he not exercise "any decision-making authority over any organization, committee, or account that receives any of its funds from a labor organization and/or its members for the purposes of contributing money to political candidates." The government responds that the district court is simply exercising its discretion in imposing this condition.

■ Section 504(a)(5) expressly authorizes the district court to enter an order preventing convicted persons such as Hughes from serving, for up to thirteen years,

in any capacity, other than in his capacity as a member of such labor organization, that involves decision-making authority concerning or decision-making authority over, or custody of, or control of the moneys, funds, assets, or property of any labor organization. ...

A trial court has broad discretion in determining the conditions of probation and on appellate review is subject to reversal only for abuse of discretion. *See United States v. Peete*, 919 F.2d 1168, 1181 (6th Cir.1990). A district court may include conditions that restrict fundamental rights, such as freedom of speech and freedom of association, although in such cases we must review the restrictions with particular care. *Id.* In *Peete*, we found that "[p]robation restrictions may affect fundamental rights such as freedom of speech and freedom of association if the conditions are primarily designed to meet the ends of rehabilitation and protect the public." *Id.*

■ We find that the restriction on Hughes' authority over union-financed political action committees was reasonably fashioned by the district court to protect union members and the general public from continued abuses by Hughes. An incidental effect of this restriction is that it will also rehabilitate Hughes by removing him from the environment that originally led to his criminal activity. The district court, in crafting a disability order unique to

Hughes, has not exceeded the bounds defined in section 504(a)(5). Admittedly, Hughes' ability to exercise his right to associate with political action committees and to participate in an activity in which union members have contributed in their *individual* capacities is limited by the court's order. However, we find this limitation on Hughes' First Amendment rights to be necessary when balanced against the right of the community to have uncorrupted union-financing of political action committees. Hughes' conduct following his first sentencing clearly demonstrates that he is still a threat to the public in this regard.

Finally, Hughes argues the district court did not fully credit him for the amount of disability he had already served under section 504(a) since the time of his first sentencing. It should be recalled that we granted Hughes an initial stay of the imposition of this disability on January 13, 1988. Hughes claims he should receive additional credit for time served under the disability, accruing as of April 4, 1990, when our decision on Hughes' first appeal was entered. Hughes argues that our June 12, 1990 order, which continued the original stay while he petitioned for certiorari, applied only to his exercise of civil rights under Ohio state law. Hughes claims that this second order, by implication, caused the resumption of federal disabilities against him.

We reject Hughes' argument that our second stay caused his federal disability period to resume. We find that the section 504(a) disability did not begin to run again until December 5, 1990, which is the date we issued the mandate to the district court ordering re-sentencing. Our memorandum and response to the *second* stay request stated:

> [A] stay of civil and employment disability had been entered by the United States Court of Appeals for the Sixth Circuit prior to the decision in this action.... It is requested that the terms of this stay be *reinstated* pending appeal to the United States Supreme Court. [italics added]

Nothing in this order limited the effect of the original stay or called for the resumption of the federal disability against Hughes.

For the foregoing reasons, we affirm the judgment of the district court.